EL PUEBLO DE PUERTO RICO, apelado, *v.* MIGUEL LÓPEZ RODRÍGUEZ, acusado y apelante.

*Número:* CR-85-47      *Resuelto:* 16 de marzo de 1987

516

518

*Felipe Cirino Colón*, de la Sociedad para Asistencia Legal, abogado del apelante; *Rafael Ortiz Carrión, Procurador General, Miriam Álvarez Archilla* y *Ricardo E. Alegría Pons, Procuradores Generales Auxiliares*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Al examinar 'esta apelación, en primer orden "recorda[mos] que todo acusado tiene derecho a un juicio *justo*, que no significa necesariamente un juicio perfecto" —*Pueblo* v. *Díaz Ríos*, 107 D.P.R. 140, 143 (1978). Segundo, que la Constitución y las Reglas de Procedimiento Criminal representan un conjunto orgánico y armónico de preceptos y sobreentendidos contentivos de derechos y deberes tanto de los acusados como del Estado. Tercero, "[l]os que redactaron las constituciones de Puerto Rico y de los Estados Unidos, ciertamente tuvieron en mente prohibir que nadie fuese *obligado* a incriminarse mediante su propio testimonio, pero no se propusieron prohibir que un delincuente confesase libre y voluntariamente su crimen haciendo así las paces con su conciencia y con la sociedad. Estas dos constituciones tienen como uno de sus objetivos proteger la libertad de la conciencia de los seres humanos, no encadenarlas al mal. Dichas constituciones no exigen que una persona que ha llegado a ser delincuente est[é] además obligada a ser mentiroso o perjuro toda su vida. Lo

ético es decir la verdad aunque eso resulte amargo. La constitución no está reñida con la ética". *Pueblo* v. *Rodríguez Martínez*, 100 D.P.R. 805, 812 (1972). Y cuarto, el "Juez no puede erigirse en un mundo aparte, encastillado e inasequible, ignorante y desconocedor del abanico de condicionamientos humanos, políticos, económicos, sociológicos, en suma, sobre los que ha de incidir su dictado corrector y desagraviante. Los problemas jurídicos y, específicamente, los judiciales, no pueden encontrar su adecuada satisfacción separados ficticiamente de ese entorno dinámico, ya que toda la razón de la ciencia del Derecho estriba en la exigencia de adecuación y servicio a la vida". F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 78.

■ Por ende, toda interpretación judicial debe siempre aspirar a "conjugar los derechos individuales que desmesurados podrían resultar conflictivos entre sí y los derechos de la comunidad en su vida, salud y bienestar . . .". 4 Diario de Sesiones de la Convención Constituyente 2576 (1951).

■ A los fines de evaluar sus méritos, reproducimos cronológicamente el trasfondo fáctico y procesal [1] en que se desarrolla la acusación, proceso, convicción y sentencia contra Miguel López Rodríguez, ante el Tribunal Superior, Sala de

---

[1] Está basada en un análisis detenido, cuidadoso y crítico de los autos originales, la prueba testifical y documental desfilada por el Ministerio Fiscal.

La veracidad de esta prueba no se cuestiona convincentemente. Aunque de .carácter circunstancial es suficiente en derecho para sostener las convicciones pues "es intrínsecamente igual que la evidencia directa". *Pueblo* v. *Ortiz Martínez*, 116 D.P.R. 139 (1985).

Los testigos de cargo fueron Ramón Collazo Ramos, el patólogo Rafael Criado, Wanda Olán Avilés, Pedro Martínez Rodríguez, Rosa J. López Rodríguez, Luz María Rodríguez, Higinio Sepúlveda López, Rafael Ramos López, el policía Oscar Ramos Camacho, el agente Daniel Martínez Pabón, Leda Almodóvar Almodóvar, el fiscal Jaime L. Zambrana Grana y los agentes Ramón Cardona Saltares y Santos González Rivera.

Mayagüez, por un jurado, en su *ausencia*, por los delitos de asesinato en primer grado y violación.

## I

Miguel López Rodríguez, de 30 años residía —junto a sus padres y otros familiares— en el Barrio Duey Bajo, Sector Sucn. Nazario, Parcelas Carolina Núm. 6, San Germán, P.R. No sabía leer ni escribir, pero podía firmar su nombre. Estudió hasta primer o tercer grado. (²) No continuó pues según sus familiares tenía dificultad para asimilar la enseñanza. Aun sin preparación académica formal, con el tiempo, en varias ocasiones viajó y se traslado por su cuenta al estado de New Jersey. Allí trabajó como obrero migrante. En fecha no determinada, antes de diciembre de 1983, fue arrollado por un automóvil. Se le afectó una pierna y no podía caminar bien. No pudo seguir trabajando y regresó a Puerto Rico. Durante esa época su hermana, Carmen María López, vivía en la Calle Las Vegas Núm. 77, Urb. Las Cumbres, carretera de Caguas hacia Río Piedras. Ella trabajaba en Lomas Verdes, Bayamón.

El 1ro de diciembre de 1983, López Rodríguez salió de su casa como a las 11:00 A.M. Pedro Rodríguez Martínez —vecino del lugar y quien lo conocía desde pequeño— fue a la tiendita de Rafael Ramos López, situada en el aludido barrio, y allí lo encontró. Estaba desde las 12:30 P.M. López Rodríguez vestía unos pantalones largos azules, una camisa de mangas cortas color gris con rayas y unos zapatos tipo "tennis" verdes y blancos. Llegó luego doña *Monserrate Sanabria Vélez*, de 68 años, también por todos conocida. Rodríguez Martínez le pagó un trago a doña Monserrate. Todos partieron juntos. En el camino los tres se dieron un "palo" de una caneca de ron

---

(²) Según el testimonio de su madre Luz María Rodríguez, estudió hasta primer grado (E.N.P., pág. 9); según su hermana Rosa J. López Rodríguez hasta tercero (E.N.P., pág. 8). La Evaluación Siquiátrica —fundada en información por él brindada— consigna: "Escolaridad: tercer grado de escuela elemental."

que López Rodríguez había comprado antes. Al llegar a su casa, como a las 5:30 P.M., Rodríguez Martínez los despidió. Doña Monserrate y López Rodríguez continuaron solos. Ella lo ayudaba a caminar pues éste no lo podía hacer bien debido al accidente.

Como a las 8:00 P.M. de ese día, López Rodríguez fue a la casa de una vecina, Wanda Avilés, y le pidió que escribiera algo importante que había sucedido. Ella se negó pues estaba enferma y en ese momento carecía de papel y lápiz. Por la forma en que le hablaba notó que López Rodríguez estaba un poco borracho.

López Rodríguez llegó a su hogar poco después de las 8:00 P.M. y comió algo en la cocina. Luego salió de su cuarto. La ropa que llevaba estaba sucia. Habló con su padre, Higinio Sepúlveda López, y éste le dijo que se fuera a dormir, pero él le replicó que se iba lejos. Tenía la camisa gris con rayas en los hombros y la dejó en una butaca. Después se marchó en camiseta.

Así las cosas, al otro día, viernes 2 de diciembre, mientras Ramón Collazo, en unión a su hermano, se dirigía hacia la finca en donde trabajaba, descubrió en el suelo el cuerpo semi-desnudo de una señora, con las piernas extendidas y hematomas en la cara. La identificó como doña Monserrate Sanabria. Inmediatamente notificó a la Policía. En compañía del sargento Martínez y el agente Oscar Ramos Caraballo regresó al lugar. La ropa de la víctima, pantalón y *panties*, estaban enrollados en el tobillo del pie izquierdo cerca del zapato amarillo, único que tenía puesto. En la otra pierna faltaba el zapato, que luego apareció como a 65 pies del cadáver. El *brassiere* estaba subido sobre los senos descubiertos. Mostraba sangre cerca de la boca, tenía los ojos negros y reflejaba golpes en la cara y cuello. Había sido estrangulada y violada.[3]

---

[3] El Protocolo de Autopsia reveló, en síntesis, los siguientes diagnósticos anatómicos: asfixia por sofocación; asfixia por estrangulación manual;

Después llegaron los agentes del Cuerpo de Investigación Criminal (C.I.C.), Santos González Rivera y Ramón Cardona Saltares. Éstos examinaron el área y se percataron de unas huellas de calzado cerca del cadáver, recuperaron varios botones, la camisa y el zapato color amarillo que estaba como a varios pies del cadáver.

Ese mismo día los agentes Santos González y Cardona Saltares se personaron al hogar de López Rodríguez. Inquirieron por él. Su padre y dichos agentes fueron a buscarlo por el área. No lo encontraron. Los agentes le dijeron a don Higinio y a su esposa, Sra. Luz María Rodríguez —madre del apelante— que los acompañaran a la fiscalía en Mayagüez. Éstos fueron y estuvieron hasta el anochecer. Allí el fiscal Jaime L. Zambrana Grana les interrogó sobre el paradero de su hijo y les indicó que era sospechoso de haberle dado muerte a la señora Monserrate. Se prestó declaración jurada.

Al día siguiente, sábado 3, el padre llamó al agente Santos González para indicarle dónde estaba su hijo. Conjuntamente lo fueron a buscar y lo encontraron en una finca. Le informaron que era el *sospechoso* de la muerte de Doña Monserrate; le hicieron *las advertencias de ley* y lo trajeron a su casa. Luego llegó el agente Cardona Saltares. Le permitieron bañarse y comer algo. López Rodríguez no habló con los agentes durante ese tiempo.

Un familiar, a solicitud del agente Santos González, le entregó la ropa que López Rodríguez tenía puesta antes. Luego se marcharon. En la tarde, en el Cuartel de Cabo Rojo, ante la presencia de los referidos agentes, el fiscal Zambrana Grana, *otra vez* le indicó que era *sospechoso del crimen* y *le*

---

fractura del hueso hioides; fractura del cartílago tiroides y aritenoides izquierdo de la laringe; petequias anóxicas asfícticas a nivel de ambos globos oculares y ambas mucosas palpebrales; laceraciones de las mucosas labiales; hematoma a nivel de la región frontal derecha y párpados derechos [*sic*]; abrasiones superficiales con incrustado de material extraño a nivel de la espalda; y laceración del recto y hemorragia perianal.

*hizo las advertencias legales.* A base de varias preguntas sobre el nombre, edad, dirección, nombres de sus familiares, su dirección y dónde había trabajado, concluyó que López Rodríguez tenía capacidad suficiente para entender lo que ocurría. Con la asistencia de la taquígrafa Leda Almodóvar Almodóvar le tomó una declaración jurada. El fiscal Zambrana Grana no le explicó amplia y detalladamente las advertencias ni le buscó *sua sponte* un abogado por no estimarlo necesario. López Rodríguez admitió y describió con lujo de detalles su crimen.

En esta misma fecha, López Rodríguez fue denunciado por asesinato en primer grado y violación. Al no poder prestar fianza fue ingresado inmediatamente en la Cárcel de Aguadilla. El 6 de diciembre se le designó abogado y citó para una vista preliminar a celebrarse el 28 de diciembre. Se suspendió pues su abogado pidió y el tribunal accedió, —bajo la Regla 240 de Procedimiento Criminal— que se evaluara si estaba mentalmente procesable.

El 6 de febrero de 1984 se rindió el informe sobre la evaluación siquiátrica realizada el 2 de febrero. *Éste consignó que no había historial de tratamiento siquiátrico previo. Expuso que mentalmente el "imputado se encuentra abordable, cooperador, y en contacto con la realidad. Su pensamiento se encuentra organizado y puede narrar hechos en forma clara, coherente y lógica. No hay alucinaciones ni se perciben delirios. Se encuentra orientado en persona, espacio y tiempo. Su memoria es adecuada, tanto para eventos remotos, como recientes. Su estado de ánimo es de moderada depresión". Por último, concluyó que López Rodríguez "era procesable pues conocía la acusación; podía narrar los hechos que la motivaron; conocía las consecuencias de sus acciones, el proceso judicial; y podía ayudar en su defensa".*

Este informe no fue cuestionado. El planteamiento sobre su procesabilidad fue sometido. Luego de resolverse en la afirmativa su procesabilidad, se señaló nuevamente la vista preliminar para el 16 de abril. Otra vez fue suspendida. El 11 de

mayo, López Rodríguez por propio derecho juró, firmó y presentó en el tribunal un documento denominado *"Desestimación Sobre la Regla 64 b"* —que está en manuscrito— y alegó que no había "sido sometido dentro de los 120 días siguientes a juicio". Finalmente, el 15 de mayo, renunció por escrito a la vista preliminar.

El 5 de junio se radicaron las acusaciones en el Tribunal Superior. El 8 de junio se leyeron. En esa ocasión, conforme la minuta, el acusado López Rodríguez solicitó diez (10) días para alegar; se señaló un *pretrial* para el 20 de junio y el juicio en su fondo para el 28 de junio. Fue citado en corte abierta. Se le hicieron las advertencias de ley en cuanto a su no comparecencia al juicio, y el acusado manifestó haber entendido las mismas. Además, el tribunal declaró sin lugar una moción de excarcelación, al amparo de la Sec. 11, Art. II, de la Constitución, que prohíbe la "detención preventiva antes del juicio" en exceso de seis (6) meses.

En la conferencia preliminar no hubo acuerdo alguno entre su representante legal y el Ministerio Fiscal. Se reiteró el señalamiento para el 28 de junio. En este día, en presencia del acusado, abogado defensor y fiscal, el tribunal de instancia cumplió con un mandato de este foro —que mediante Sentencia en el recurso O-84-413 de 27 de junio— dispuso la inmediata excarcelación de López Rodríguez por haber transcurrido seis (6) meses de prisión preventiva. No se fijó fecha del juicio, sino que se optó por hacerlo posteriormente. La defensa renunció expresamente a los términos de juicio rápido.

Subsiguientemente, la vista en su fondo se señaló para el 10 de septiembre de 1984. Fueron citados y comparecieron todos los testigos, menos el acusado. No pudo ser localizado ni citado personalmente. Su abogado asistió. Se señaló entonces para el 8 de octubre. En esta ocasión tampoco compareció. Se unió a autos un diligenciamiento negativo del alguacil Neri Casiano Bracero acreditativo de que: (1) el 3 de octubre —en unión al alguacil Félix Santana Feliú— se trasladó a San Ger-

mán para citar al acusado a su dirección en el Bo. Duey Bajo; (2) se personó a dicho sitio y entrevistó a la madre del acusado, quien le indicó desconocer el paradero de su hijo, pues éste, después de haber salido en libertad, se marchó inmediatamente a la casa de su hermana Carmen María López en Caguas; (3) que dos semanas después esta hija le informó que él había desaparecido y no sabía dónde estaba; (4) que no tenía noticias de él, y que en ocasiones anteriores había ido a trabajar a New Jersey y ella lo sabía después, pues nunca informaba de sus planes, y (5) que estaba completamente segura de que su hijo no se encontraba por el área de San Germán, pues le temía a las represalias de la familia de la víctima. En esa ocasión los alguaciles también entrevistaron a dos hermanas del acusado, Sras. Candy y Jean López, quienes corroboraron la versión de la madre.

El tribunal otra vez señaló la vista para el 10 de octubre. Ordenó a los alguaciles que se trasladaran al Área Metropolitana a investigar. Así lo hicieron el 9 de octubre. Conforme sus gestiones localizaron la residencia de la hermana del acusado, Carmen María López, en la Urb. Las Cumbres. Ella no estaba. La residencia estaba cerrada. Los vecinos confirmaron que a principios de julio el acusado estuvo residiendo allí. Lo reconocieron por una fotografía. No lo habían visto después. Los alguaciles fueron al Presidio Estatal. El resultado fue negativo ya que en la oficina de records no apareció nadie ingresado con su nombre y datos personales. De ahí se personaron al lugar de trabajo de la hermana en Bayamón. Ella les confirmó que su hermano residió en su casa desde el 28 de junio hasta mediados de julio en que se marchó. Al irse se llevó su ropa. Cree que tenía algún dinero.

Enterado de estas gestiones el tribunal señaló vista y citó la prueba para el 26 de diciembre de 1984. Otra vez el caso se suspendió para el 25 de marzo de 1985 consignando el foro de instancia que de no comparecer el acusado se celebraría el juicio en ausencia. En esta ocasión el tribunal inquirió infruc-

tuosamente de los padres de López Rodríguez su paradero. Éstos informaron también desconocerlo. Ese día, luego de resumir para el récord los trámites habidos, dicho foro estimó que lo procedente era que el caso quedara fuera del calendario regular con seguimiento cada 60 días. Se basó en que no se había citado específicamente al acusado.

El 28 de mayo, el tribunal ordenó se ventilara el juicio en ausencia y señaló la vista para el 25 de junio de 1985. Ese día se transfirió para el 29 de julio. Por la incomparecencia del patólogo se suspendió para el día siguiente. Este día —30— finalmente comenzó, y se inició el proceso de desinsacular al jurado. El trámite se completó el 2 de agosto. El 6 de agosto el tribunal evaluó unos planteamientos de la defensa y los declaró sin lugar. El juicio comenzó el 7 y se ventiló durante los días 8, 9, 13, 14 y 15 en que finalizó con un veredicto de culpabilidad. El 19 de agosto se dictó sentencia de 99 y 50 años de reclusión, consecutivas entre sí. Se declaró prófugo de la justicia al convicto López Rodríguez.

El 6 de septiembre, su representación legal apeló. Culminados los trámites correspondientes, en su apelación discute los errores que a continuación analizamos.

## II

El primero cuestiona la celebración del juicio y el dictar sentencia en ausencia del acusado sin jurisdicción. Se aduce violación del debido proceso de ley. No procede.

El examen de los autos originales refleja que el acusado siempre compareció asistido de abogado. Específicamente, en el acto de lectura de la acusación —conforme la minuta del 8 de junio de 1984— surge que el tribunal señaló el juicio para el 28 de junio de 1984 y fue citado en corte abierta. En aquel momento se le hicieron las advertencias de ley sobre el efecto que tendría de no comparecer al juicio y éste manifestó haberlas comprendido. En el ínterin, compareció personalmente a la conferencia preliminar pautada para el 20 de junio. También

estuvo presente el 28 de junio. Sagazmente, al ser excarcelado en virtud de nuestra sentencia —según se deduce de la investigación realizada por el tribunal— inmediatamente abandonó el hogar en que de manera permanente residía, y se trasladó temporeramente a Río Piedras, a casa de su hermana. Después desapareció. Obviamente su propósito fue ocultarse para evitar así ser citado e impedir al tribunal continuar el proceso. Han transcurrido más de tres (3) años del asesinato de Doña Monserrate Sanabria Vélez. Igual término próximamente se cumplirá desde que López Rodríguez a sabiendas se ocultó. Todavía no ha aparecido. En estas circunstancias, ¿puede legítimamente dudarse que su incomparecencia fue voluntaria e intencional? ¿Cuánto tiempo debe esperarse sin desprestigiarse el sistema de administración de justicia criminal; sin que el tiempo afecte negativamente la efectividad y sinceridad de la prueba testifical disponible?

■ En el pasado, insistentemente hemos sostenido que el derecho a juicio rápido y "la pronta solución de casos no es interés exclusivo del acusado sino de toda la comunidad". *Pueblo* v. *Rivera Tirado*, 117 D.P.R. 419, 431 (1986). Y en *Pueblo* v. *Rivera Navarro*, 113 D.P.R. 642, 646–647 (1982) dijimos:

Irónicamente, para algunos acusados el propiciar suspensiones "adelanta" sus causas, pues contribuye al deterioro de la evidencia por la indisponibilidad de testigos —ausencia, desaparición o muerte— y pérdida de la memoria sobre hechos esenciales. Estudios en varias jurisdicciones demuestran que, por regla general, no les interesa ventilar sus casos con prontitud. Puerto Rico no es la excepción. Esta actitud forma parte de la sicología, naturaleza y conducta humana inherentes a la dinámica procesal. Choca con el ideal constitucional de un "juicio rápido". Al protagonista del esquema forense penal le resulta ventajoso controlar indirectamente el momento en que se ventile el caso en su fondo.

Repetimos, cada suspensión conlleva unos desembolsos que no sólo gravan la rama judicial, sino a los demás compo-

nentes principales e incidentales del sistema: policía, fiscales, asistencia legal y ciudadanía en general. Implica gastos relacionados con los trámites y documentos ordinarios, citación, pago de dietas y otros. Los testigos experimentan gastos en transportación, pérdida de ingresos que no son compensables mediante las módicas dietas y sufren distintos tipos de inconveniencias. Sobre todo, afecta y debilita la confianza en la administración de la justicia y fomenta un sentido de injusticia, inseguridad e incertidumbre por la tardanza en la determinación final fáctica y jurídica de la controversia.

■ Afortunadamente las Reglas 58 (b) y 243 (a) de Procedimiento Criminal gobiernan esta situación y sabiamente proveen una solución. Respectivamente rezan: (⁴)

En el acto de lectura de acusación, el tribunal señalará la fecha para el juicio y *apercibirá al acusado que de no comparecer, podrá celebrarse el juicio en su ausencia, incluyendo la selección del jurado y todas las otras etapas hasta el veredicto o fallo y el pronunciamiento de la sentencia y que su incomparecencia voluntaria equivaldrá a una renuncia a estar presente en estas etapas del proceso.* (Énfasis suplido.)

. . . . . . . .

Delitos graves. En todo proceso por delito grave (*felony*) *el acusado deberá estar presente* en el acto de la lectura de la acusación *y en todas las etapas del juicio,* incluyendo la constitución del jurado y la rendición del veredicto o fallo, y en el pronunciamiento de la sentencia. *Si el acusado ha comparecido al acto de la lectura de la acusación, y habiendo sido advertido conforme a la Regla 58 y citado para*

---

(⁴) El lenguaje actual de ambas reglas responde a las enmiendas introducidas por la Ley Núm. 138 de 23 de julio de 1974 —a tono con una de las recomendaciones del *Informe de la Comisión para el Estudio de la Policía del Consejo sobre la Reforma de la Justicia,* diciembre de 1974, págs. 174–185. Su propósito es desalentar la práctica de algunos acusados evadir voluntariamente su responsabilidad con los tribunales de justicia, imprimirle rapidez a los procedimientos, evitar suspensiones indebidas, que la ciudadanía pierda fe en el sistema y que el "transcurso del tiempo favorezca a los acusados". Íd., pág. 175.

*juicio no se presentase, el tribunal luego de investigadas las causas,* podrá celebrar el mismo en su ausencia hasta que recayere fallo o veredicto y el pronunciamiento de la sentencia, siempre que el acusado estuviese representado por abogado. Si en cualquier etapa durante el juicio el acusado no regresare a sala para la continuación del mismo, el tribunal luego de investigadas las causas, podrá dictar mandamiento ordenando su arresto, pero en todo caso la ausencia voluntaria del acusado no impedirá que el juicio continúe hasta que se rinda el veredicto o el fallo y el pronunciamiento de la sentencia. (Énfasis suplido.)

A su amparo y trascendiendo su literalidad habíamos interpretado amplia e integralmente su alcance. Desde *Pueblo v. Colón Colón,* 105 D.P.R. 880, 886 (1977), sostuvimos que "[l]a Regla 243 exige que el tribunal antes de proceder con el juicio 'investigue' la causa de la ausencia pero tal investigación previa no tiene ni la dimensión ni la formalidad que reclama el apelante. *En este caso dicha determinación de presunta voluntariedad en la ausencia quedó cumplida una vez enterado el tribunal de las infructuosas gestiones del alguacil y del fiador por localizar en la jurisdicción al acusado desaparecido".* Y en *Pueblo v. Ruiz Lebrón,* 111 D.P.R. 435, 443–444 (1981), enfatizamos que "la renuncia a estar presente en el juicio . . . se toma como tal si al comenzar el juicio, el acusado informado de los cargos en su contra por haber asistido al acto de lectura de la acusación, no comparece a tribunal. *Pueblo v. Bussman,* 108 D.P.R. 444 (1979)".

No puede prevalecer la tesis de que no procedía el juicio porque después de la vista de la lectura de acusación, no se le citó específicamente para una fecha. En las circunstancias peculiares del caso, su ausencia voluntaria inevitablemente derrota esa contención. Fue debidamente informado de los graves cargos que pesaban en su contra. Tenía abogado. Por derecho propio y a través de abogado dio todos los pasos y adoptó varias medidas demostrativas de un conocimiento

cabal de sus derechos. En ningún momento estuvo en estado de indefensión. Su intencional desaparición debe estimarse como una renuncia a su derecho a estar presente en el juicio. Aunque de rango constitucional, ese derecho es renunciable. *Pueblo v. Torres Nieves*, 105 D.P.R. 340, 350 (1976). Lo contrario implicaría dejar in extremis huérfano al interés público para ventilar las causas criminales. Recuérdese que en *Pueblo v. Pedroza Muriel*, 98 D.P.R. 34, 38 (1969), rechazamos esa posición, pues "los acusados estarían en libertad de obstruir la celebración de los juicios una vez comenzados éstos, ocultándose o haciendo imposible su localización".

De prevalecer la interpretación propuesta, estaríamos anulando la intención legislativa plasmada en las Reglas 58(b) y 243(a) antes transcritas, afectando adversamente el prestigio y los postulados básicos en que se cimenta nuestro sistema de administrar justicia. No importa cuántas advertencias se hayan hecho a un acusado de su derecho a comparecer y estar presente en el juicio; que se le haya designado abogado; que se haya cumplido con el acto de la lectura de la acusación y señalado la vista, si subsiguientemente ésta se suspende, y después no puede citársele, ¿significará que éste impunemente puede entonces ocultarse, para evitar ser finalmente citado y juzgado, interrumpiendo así la continuación del proceso?

▆▆▆▆▆ Uno de los ingredientes en que de ordinario se asienta toda la norma jurídica es el de las probabilidades. Y en materia de hermenéutica, la regla de que el sentido común está inmerso en toda interpretación. Presumiblemente todo acusado en libertad controla sus movimientos fuera de los tribunales. Como tal, puede adoptar el curso de acción que estime más conveniente a su defensa. Lógicamente ello no es licencia para tomar ventajas, violar y obstaculizar impunemente la eficaz administración de la justicia e ignorar y desatenderse el tribunal que va a juzgarle. Lo contrario es un contrasentido que derrotaría los mejores fines de la justicia y proyectaría

532

una imagen de incertidumbre e impotencia. El debido proceso de ley no se apuntala en dejar al capricho de los acusados cuándo se ventilarán los casos.

Aquí no se cuestiona el derecho a estar presente. Más bien examinamos si la conducta del acusado López Rodríguez es indicativa de un rechazo y renuncia a ese derecho. ¿Qué justificación existe para que el proceso sea paralizado —sin consecuencias— por ocultarse una vez advertido de la acusación y de que se le podía juzgar en ausencia?

*Brewer* v. *Raines*, 670 F.2d 117, 118–119 (1982), compendia elocuentemente la respuesta e interpretación que debe prevalecer:

Es correcto que uno de los derechos más básicos de los garantizados por la cláusula de confrontación es la del acusado estar presente en toda etapa del juicio. *Lewis* v. *United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). Sin embargo, es igualmente cierto que ese derecho es renunciable. La noción de que un juicio no procede en ausencia de un acusado, ha sido expresamente rechazada. *Illinois* v. *Allen,* 397 U.S. 337, 90 S.Ct. 1057. 25 L.Ed. 353 (1970) ; *Snyder* v. *Masachussetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed., 674 (1934) ; *Díaz* v. *United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912).

La discusión de la Corte Suprema en *Díaz* es aquí especialmente apropiada. La Corte, citó con aprobación de *Falk* v. *United States,* 15 App.DC. 446, apelación desestimada 180 U.S. 636, 24 S.Ct. 922, 45 L.Ed. 709 (1901). En *Falk* el acusado estaba presente cuando comenzó el juicio, pero huyó de la jurisdicción durante la presentación del caso por el gobierno. El juicio concluyó en ausencia y el acusado fue convicto. Al confirmar la convicción, la Corte de apelaciones dijo:

"No nos parece compatible con los dictados del sentido común que una persona acusada, libre bajo fianza, pueda desligarse de las cortes e interrumpir un juicio comenzado. El resultado práctico de esa proposición, de aceptarse en derecho, sería evitar cualquier juicio cuando así lo desea la persona acusada. Ello sería una burla a la

justicia que no se puede tolerar; y no es requerida ni se justifica en atención a la libertad personal.

"El asunto es uno de amplia política pública. Si un acusado de un crimen, sometido a un juicio y protegido con todas las garantías con que la humanidad celosamente al presente ha rodeado el derecho penal, puede impunemente desafiar los procesos legales, paralizar los procedimientos ante las cortes y jurados y convertirlos en una solemne farsa, y en última instancia, obligar a la sociedad, para su propia seguridad, restringir la operación del principio de libertad personal. Ni en casos criminales ni civiles la ley permite a una persona tomar ventajas de su propio agravio. Y precisamente esto sería lo que pasaría si le permitiésemos escapar de la cárcel, o evadirse de la jurisdicción mientras está libre bajo fianza, pendiente un juicio ante jurado y que ello operara como un escudo. 223 U.S. 457–58, 32 S.Ct. 254–255."

Suscribimos estas preocupaciones finamente articuladas. Un acusado, que con conocimiento, inteligente y voluntariamente se ausenta de su juicio, renuncia al derecho de confrontación de la Sexta Enmienda. *Y no debe haber malos entendidos. Nada en Díaz sugiere que esa ausencia voluntaria debe ocurrir después que el juicio haya comenzado para que opere la renuncia.* Simplemente esa fue la situación en que allí surgió el asunto. *Una corte no está impedida de celebrar un juicio si el acusado voluntariamente renuncia a estar presente antes de comenzar el juicio.* (Traducción y énfasis nuestros.)

Con igual pragmatismo judicial y sentido común en *Márquez Quiñones* v. *Tribunal de Distrito*, 105 D.P.R. 203, 207 (1976), establecimos el principio —en protección del derecho constitucional a un juicio rápido—, en todas las etapas del procedimiento, un "acusado viene obligado a informar al tribunal su cambio de domicilio, para que puedan cumplimentarse en tiempo las citaciones a él dirigidas. Si se ausenta de la dirección residencial por él informada, sin notificar el cambio de dirección, su conducta no es menos que una renuncia a los términos que en la Regla 64 de Procedimiento Criminal

534

implementan la garantía constitucional de un juicio rápido".
Análogo razonamiento y justificación se impone en cuanto a
este deber para lograr la presencia del acusado en todas las
etapas del proceso, una vez advertido de la naturaleza y
gravedad de los cargos y de su deber de comparecer, so pena
de ventilarse en su ausencia el juicio. (5)

En resumen, en el caso de autos se cumplieron sus-
tancialmente los requisitos procesales. A López Rodríguez, en
el acto de lectura de acusación el tribunal le señaló la fecha de
28 de junio de 1984 para el juicio; le apercibió de que su au-
sencia equivaldría a una renuncia a estar presente en toda
otra etapa, y finalmente se investigaron plena y satisfactoria-
mente las razones de su ausencia. *Pueblo* v. *Lourido Pérez*,
115 D.P.R. 798 (1984). "Esta información era suficiente para
derivar una renuncia al derecho a estar presente. [Su] fra-
caso a conocer las fechas en que continuaría el proceso, y la de
su sentencia, es atribuible directamente a su omisión de man-
tener contacto con el tribunal y su abogado." (Traducción
nuestra.) *Brewer* v. *Raines*, supra, pág. 119.

### III

El segundo error impugna la admisibilidad de la confesión
escrita del acusado prestada al fiscal Zambrana Grana. Se
aduce que fue involuntaria "por no haber sido prestada cons-
ciente e inteligentemente".

Según hemos relacionado, la prueba reveló y así lo enten-
dió preliminarmente el tribunal, que la confesión era válida y
admisible. Sobre este extremo declararon la taquígrafa Leda
Almodóvar Almodóvar y el fiscal Zambrana Grana. Luego, so-
metido el asunto al jurado, éste le dio entero crédito a ambos

---

(5) Desde que prestó su declaración jurada, en las denuncias y acusa-
ción, siempre se hizo constar la dirección de Bo. Duey Bajo, Parcelas Caro-
lina, Núm. 6, San Germán, Puerto Rico. La prueba de cargo, incluso el
testimonio de sus familiares inmediatos así plenamente lo confirma.

testigos. El fiscal Zambrana Grana rigurosamente le hizo todas las advertencias de ley. El acusado indicó comprenderlas. Adviértase que ésta era la *segunda* vez que le hacían tales advertencias. Sus familiares inmediatos —padres y hermanos— cooperaron en la investigación y mantuvieron contacto con el acusado. Incluso se le preguntó si quería que estuviera un hermano presente y éste rehusó.

No obstante, se argumenta que dicha declaración era inadmisible pues siendo analfabeto y de pocas luces intelectuales, no podía renunciar válidamente a sus derechos constitucionales. Además, se sostiene que debieron explicarse con ejemplos y ampliarse más detalladamente las advertencias. Se enfatiza que el fiscal Zambrana Grana específicamente no le informó que "con su declaración podía ser juzgado por violación y asesinato". (E.N.P., pág. 17.) El señalamiento es inmeritorio. Veamos.

■ Primeramente es importante despejar toda confusión al respecto. Analfabetismo no es sinónimo de incapacidad mental, como tampoco es condición que impida el ejercicio o la renuncia válida de importantes derechos constitucionales. De hecho, nuestra Constitución rechaza esa noción en la Sec. 4, Art. VI, *in fine*, al reconocer que "[n]adie será privado del derecho al voto por no saber leer o escribir". Y en una actividad tan importante como la de manejar automóviles, la Ley Núm. 77 de 20 de junio de 1974 (9 L.P.R.A. sec. 653(c)) autoriza la expedición de licencia de conducir —previo a tener una licencia de aprendizaje y someterse a un examen oral y práctico— a personas *analfabetas*.

Segundo, todos los indicadores evidenciarios y objetivos en la prueba son contrarios a la tesis de que el acusado fuera un incapacitado o no pudiera comprender la consecuencia de sus actos. La declaración ante el fiscal Zambrana Grana fue prestada el 3 de diciembre de 1983. Desde ese instante se pudo constatar su discernimiento y aptitud. Dicho funcionario, aun-

que brevemente —antes de interrogar— lo examinó y acreditó su capacidad general para entender sus derechos. Escasamente dos meses después, López Rodríguez fue examinado y evaluado por un psiquiatra. Según hemos relatado, en el informe rendido sobre procesabilidad se expuso que mentalmente estaba capacitado, esto es, en contacto con la realidad, de pensamiento organizado, podía narrar hechos clara, coherente y lógicamente, orientado en su persona, espacio y tiempo y de memoria adecuada. Además, se demostró que conocía la acusación, los hechos que la motivaron, sus consecuencias y el proceso. Ni éste ni su abogado cuestionaron la validez de estas conclusiones.

Tercero, tampoco debe haber dudas de que adecuadamente fue informado de sus derechos en el lenguaje acostumbrado, sencillo y comprensible, aun para una persona de escasa preparación formal educativa. Que el fiscal Zambrana Grana no le proveyera ejemplos o no usara el lenguaje exacto de que *"con su declaración podía ser juzgado por violación y asesinato"*, no anula la eficacia y suficiencia de tales advertencias. Las advertencias brindadas y el lenguaje usado por el fiscal son suficientes. Del propio texto de la declaración jurada surge cabalmente que López Rodríguez *sabía* que era investigado por el asesinato y violación de doña Monserrate y que él era sospechoso del crimen. Del examen integral de todas las advertencias —en particular del apercibimiento específico del fiscal de que estaba "investigando la muerte de Doña Monserrate", y que él "era el sospechoso en este caso"— aflora que se le comunicó adecuadamente y mediante lenguaje común, de fácil captación, el mensaje en que se pretende asentar este error.

El Tribunal Supremo federal ha rechazado planteamientos análogos. Ha resuelto que las advertencias no tienen que seguir el lenguaje exacto de *Miranda* v. *Arizona*, 384 U.S. 436 (1966), a modo de hechizo talismático (*talismatic incantation*). *California* v. *Prysock*, 453 U.S. 355 (1981). La

doctrina no requiere esa rigidez. Más aún, si a un acusado "se le ha dicho la sustancia de sus derechos constitucionales, no es fatal la omisión de palabras irrelevantes o sin sustancia independiente". (Traducción nuestra.) *United States* v. *Noti*, 731 F.2d 610, 614–615 (1984). Como recientemente dijo el más alto foro federal: "Hemos sostenido que una renuncia válida no requiere que un individuo sea informado de toda información 'provechosa' para hacer su decisión o toda información que pudiera . . . afectar su decisión de confesar." (Traducción nuestra.) *Colorado* v. *Leroy*, 55 L.W. 4162, 4165 (1987). Y en *Moran* v. *Burbine*, 54 L.W. 4265, 4267 (1986) : "Sin duda que esa información adicional pudo serle útil al acusado; inclusive pudo haber afectado su decisión de confesar. Pero nunca hemos leído la Constitución para requerir que la policía [o fiscal] suministre a un sospechoso un flujo de información que le ayude a calibrar su propio interés en decidir si habla o se mantiene en sus derechos." (Traducción nuestra.)

Cuarto, en *Pueblo* v. *Guadalupe Rosa*, 94 D.P.R. 190, 194–195 (1967), estimamos suficientes unas advertencias como las del caso de autos. Igualmente aquí, en verdad y como cuestión de realidad, la confesión quedó rodeada de todas dichas garantías. Como consecuencia, esa confesión voluntariamente hecha por el acusado, con conocimiento pleno de todos sus derechos constitucionales, era admisible. Véase *Pueblo* v. *Alcalá Fernández*, 109 D.P.R. 326, 333 (1980).

Y quinto, ninguno de los testigos arrojaron dudas sobre la voluntariedad y circunstancias normales en que se produjo la confesión. No hay la más mínima prueba de amenaza física o violencia. Tampoco que estuviera bajo los efectos del cansancio, que fuera privado de sueño o que se le negara agua o comida. *Martin* v. *Wainwright*, 770 F.2d 918 (1985). No se le expuso a un interrogatorio prolongado ni se le hicieron promesas de beneficios. Estuvo en contacto con sus familiares más próximos.

█ En resumen, la actuación del fiscal Zambrana Grana fue correcta. Advirtió adecuadamente al acusado —luego de apercibirle que era sospechoso y que estaba siendo investigado con relación al crimen de la occisa Monserrate Sanabria Vélez— sobre sus derechos constitucionales a mantenerse en silencio, no incriminarse y a tener allí asistencia de abogado según las normas establecidas en *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965), a tono con *Escobedo* v. *Illinois*, 378 U.S. 478 (1964). Le informó además que de no tener abogado o dinero para pagarlo, el Estado se lo proveería. Véase *Pueblo* v. *De Jesús Cabrera*, 94 D.P.R. 450 (1967). También a estar acompañado de un familiar, en particular, su hermano Jorge L. López.

Los autos y prueba revelan que la renuncia del apelante a los derechos que la ley le concede fue inteligente y voluntaria. No se cuestiona persuasivamente su voluntariedad. No se argumenta, como tampoco sugiere la existencia de malicia, coacción física o mental, intimidación, engaño o que mediaran promesas. Hemos visto cómo la involuntariedad se predica en el supuesto, no demostrado, de "no haber sido prestada consciente e inteligentemente". Respecto a la consciencia e inteligencia de la renuncia, una simple lectura de la declaración jurada en cuestión —unido a su conducta antes y después del asesinato, según descrita por los testigos— nos convence de que tenía, aun sin saber leer y escribir, la capacidad necesaria para entender el alcance pleno de las advertencias, y su significado y probables consecuencias de su confesión. El que las advertencias no fuesen ejemplarizadas o explicadas más ampliamente, no ha causado lesión constitucional.

█ Recientemente, el Tribunal Supremo federal, en *Colorado* v. *Leroy*, supra, págs. 4164-4165, precisó así su alcance contemporáneo:

La Quinta Enmienda de la Constitución de los Estados Unidos dispone que ninguna persona "será compelida en

ningún caso criminal a declarar contra sí mismo". Este privilegio "es enteramente aplicable a un período de interrogatorio bajo custodia". *Miranda* v. *Arizona,* 384 U.S. 460–461. En *Miranda,* la Corte concluyó que "sin garantías apropiadas el proceso de interrogatorio a personas sospechosas o acusadas de un crimen en custodia inherentemente conlleva presiones que compelen y actúan para minar la voluntad del individuo a resistir y le obligan a hablar allí donde de otro modo libremente no lo hubiese hecho". *Id.,* 467. De conformidad, la Corte formuló, al presente conocidas, "salvaguardas efectivas procesales para asegurar el privilegio contra la autoincriminación". *Id.,* 444. El objetivo fundamental de la Corte al diseñar las advertencias de *Miranda* fue "asegurar al individuo que el derecho a escoger entre el silencio o el hablar se mantuviera sin trabas a través de interrogatorios". *Id.,* 469.

Consistente con este propósito, un sospechoso puede renunciar a su privilegio de la Quinta Enmienda, "si la renuncia es voluntaria consciente e inteligente". *Id.,* 444. . . . La encuesta de si la renuncia es obligada "tiene dos dimensiones distintas". *Moran* v. *Burbine,* 475 U.S. — (1986) [54 L.W. 4265] :

> "Primero, el abandono del derecho debe haber sido voluntario en el sentido de que sea producto de una elección libre y deliberada en vez de la intimidación, coacción o engaño. Segundo, la renuncia debe hacerse con pleno conocimiento no sólo del derecho abandonado sino de las consecuencias de esa decisión. Sólo si de la 'totalidad de las circunstancias que rodearon el interrogatorio' revela ambos, decisión libre y nivel de comprensión, puede apropiadamente la Corte concluir que los derechos de *Miranda* han sido renunciados. *Ibid.* (citando *Fare* v. *Michael C.,* 442 U.S. 707, 725 (1979) )."

No existe duda que aquí la decisión . . . de renunciar su privilegio a la Quinta Enmienda fue voluntaria. No alega "coacción en la confesión por violencia física u otro medio deliberadamente calculado para romper [su] voluntad", *Oregon* v. *Elstad,* 470 U.S. 298, 312 (1985), y la corte de instancia no encontró ninguno. Su alegación que la policía falló en suministrarle cierta información no está relacionada

con los indicadores tradicionales de la coacción: "la duración y condiciones de la detención . . . , la actitud manifestada de la policía hacia él, su estado físico y mental y las diversas presiones que minan o sostienen su poder de resistencia y autocontrol". *Culombe* v. *Connecticut,* 367 U.S. 568, 602 (1961) (opinión del Juez Frankfurter). En ausencia de evidencia de que . . . la "voluntad . . . fue avasallada y debido a conducta coercitiva policiaca su capacidad para autodeterminación menoscabada críticamente", *ibid.*; véase *Colorado* v. *Connelly,* 479 U.S. —, — (1986), su renuncia al privilegio de la Quinta Enmienda fue voluntaria bajo la decisión de esta Corte en *Miranda.*

Tampoco existe duda que [esa] renuncia fue inteligente y concientemente hecha, esto es, que entendió que tenía el derecho a mantener silencio y que cualquier cosa que dijera podía usarse como evidencia en su contra. La Constitución no requiere que un sospechoso de un crimen conozca y entienda todas las consecuencias posibles de una renuncia al privilegio de la Quinta Enmienda. *Morán* v. *Burbine,* supra; *Oregon* v. *Elstad,* supra, págs. 316–317. (Traducción nuestra.)

El error no fue cometido. ([6])

---

([6]) Aun bajo la hipótesis errónea de que no debió admitirse esa confesión —y en vista de que según la prueba antes detallada de carácter circunstancial e inferencias lógicas y razonables concluyentemente se demostró más allá de duda razonable que él fue el autor del crimen— pues, sin contradicciones de ningún tipo *todos* los testigos, incluyendo sus familiares inmediatos, produjeron los datos que evaluados, integral y desapasionadamente, apuntan hacia esa sola conclusión, *quaere,* si por ser la confesión *acumulativa,* su exclusión hubiese variado el veredicto y el error cometido no perjudicial más allá de duda razonable. Veamos.

En nuestra jurisdicción la Regla 4 de Evidencia regula la situación sobre los efectos de evidencia erróneamente admitida. Reza:

"No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:

"(1) La evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción de la parte perjudicada por la admisión, y

"(2) El tribunal que considera el efecto de la admisión errónea entiende que ésta fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita."

## IV

Finalmente, en el último señalamiento se objeta la admisión de la ropa que usó López Rodríguez al cometer el crimen y unas prendas personales de la víctima doña Monserrate. Se

Esta regla recoge la norma judicial del "error judicial" expuesta en *Pueblo* v. *De Jesús,* 70 D.P.R. 37 (1949). Rechaza, como método adjudicativo, el automatismo revocatorio por errores evidenciarios. Su aplicación precisa que se admita erróneamente la evidencia, sobre la oportuna objeción y el fundamento correcto de la parte perjudicada. En el caso de autos se cumplió adecuadamente el primer requisito. Nos tocaría, como tribunal apelativo, evaluar si concurre el segundo, a saber, si en efecto, esa errónea admisión fue factor decisivo o sustancial en el veredicto de culpabilidad rendido por el jurado.

La casuística y glosa distingue entre error no perjudicial y el error constitucional. E. L. Chiesa, *Práctica Procesal Puertorriqueña,* San Juan, Pubs. J.T.S., 1985, Evidencia—Vol. I, págs. 9–10. Bajo esta última clasificación, la cuestión implica examinar la magnitud y consecuencias del error, en vista de su linaje constitucional.

Es ilustrativa y persuasiva la reacción judicial iniciada en *Chapman* v. *California,* 386 U.S. 18 (1967). Allí el Tribunal Supremo federal rechazó la idea de que todo comentario al silencio del acusado —sin tomar en cuenta los hechos y circunstancias del caso— conllevaba revocar la sentencia. Elaboró la fórmula de que antes de un "error constitucional" poder ser considerado no perjudicial, el tribunal debe así convencerse "más allá de duda razonable". Dicho foro basó su decisión en la existencia de legislación federal y estatal, que como materia universal de derecho probatorio, regula el extremo relativo a los errores no perjudiciales cometidos en los juicios. Bajo ese postulado hizo los siguientes pronunciamientos:

"Ninguna de estas reglas, de su letra distingue entre errores constitucionales federales y errores de ley estatal o estatutos y reglas federales. Todas estas reglas, estatales o federales, sirven un propósito muy útil en cuanto impiden anular condenas debido a pequeños errores o defectos que tendrían poca, si alguna probabilidad de haber cambiado el resultado del juicio. Podrían haber algunos errores constitucionales que, para establecer un caso en particular, son tan poco importantes e insignificantes que, de acuerdo a la Constitución federal, podrían considerarse inofensivos y no requerirían la revocación automática de la condena." Pág. 22.

Entre los distintos derechos susceptibles de este análisis, el Tribunal Supremo, por voz mayoritaria del Juez Douglas, en *Harrington* v. *California,* 395 U.S. 250 (1969), amplió la norma para cubrir confesiones erróneamente admitidas. Expuso:

"Se argumenta que debemos revocar si podemos imaginarnos que un solo jurado cuya mente pudo hacerse a base de las confesiones, de otro modo pudo haber tenido dudas y no haberse convencido. Nosotros, claro está, no conocemos a los jurados que intervinieron. Nuestro juicio debe estar basado

argumenta que "no se estableció la cadena de evidencia". Además se cuestiona la presentación en evidencia de las fotografías como "grotescas que incidieron negativamente en el ánimo del jurado".

En ninguna de sus vertientes el señalamiento procede. Varios testigos de cargo, sin albergar dudas, declararon sobre el carácter legítimo de la ropa. Incluso los padres y una hermana del acusado así lo atestaron. Sus prendas de vestir fueron entregadas por un familiar al agente Santos González. Éste las identificó. En cuanto a las de la occisa Sanabria Vélez, sus pertenencias personales también fueron debidamente identificadas.

Adviértase que no estamos ante material evidenciario susceptible de variar o sufrir deterioro sustancial. Tal peligro no existió en el caso que nos ocupa. Tampoco se nos ha demostrado. *Pueblo* v. *Bianchi Álvarez*, 117 D.P.R. 484 (1986).

---

en la lectura propia del récord y en lo que nos parece que probablemente fue el impacto de dos confesiones en las mentes de jurados razonables.

"No nos apartamos de *Chapman*, ni por inferencia lo diluimos. Lo reafirmamos. No sugerimos que, si toda evidencia relacionada con todos los ingredientes del crimen es frágil, el uso de evidencia *acumulativa*, aun cuando sea manchada, es un error no perjudicial."

La más reciente adhesión a esta expresión es *Martin* v. *Wainwright*, 770 F.2d 918, 932 (11mo Cir. 1985).

Este enfoque se ha expandido para cubrir errores relativos a violaciones de las advertencias de *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Las mismas "[p]ueden ser considerados errores no perjudiciales". *Germany* v. *Estelle*, 639 F.2d 1301, 1303 (1981); *United States* v. *Steward*, 576 F.2d 5055 (1978); *United States* v. *Savell*, 546 F.2d 43, 46 (1977); *Harryman* v. *Estelle*, 616 F.2d 870 (1980); *United States* v. *Sánchez*, 422 F.2d 1198 (1970); *United States* v. *Richards*, 430 F.2d 1240 (1970); *People* v. *Doherty*, 429 P.2d 177 (1967); *United States* v. *Jackson*, 429 F.2d 1368 (1970).

*United States* v. *Hasting*, 461 U.S. 499, 508–509 (1983), reiteró que las cortes de apelaciones federales no pueden "ignorar el análisis de error no perjudicial de *Chapman*". Nuevamente se dijo:

"Al resolver que en ciertas circunstancias la regla del error no perjudicial rige aun ante violaciones constitucionales, [esta] corte ha reconocido que, en vista de las numerosas garantías provistas para asegurar un juicio justo, y tomando en consideración la realidad de la falibilidad humana de los participantes, no puede haber, como tal, un juicio perfecto, libre de error, y que la Constitución no garantiza tal juicio."

Respecto a las fotografías, no podemos atribuirle al jurado una sensibilidad extrema. *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471, 483 (1961). Hay crímenes, como el de autos, que por su naturaleza, exigen que sus características y consecuencias sean presentadas ante el jurado. Máxime cuando la prueba es circunstancial. De lo contrario, sería imposible juzgarlos adecuadamente sin ese contacto. El mero hecho de que una fotografía pueda impresionar desfavorablemente al jurado no justifica su exclusión. *Pueblo* v. *Zayas Ortiz*, 65 D.P.R. 538, 541 (1946) ; *Pueblo* v. *Rivera*, 69 D.P.R. 538, 541 (1949). Después de todo, a este cuerpo le corresponde conocer todo lo relacionado con la causa que juzga, de forma tal que pueda estar en mejor condición de rendir un veredicto informado y justo. *Pueblo* v. *Rivera Romero*, supra.

En conclusión, el error no fue cometido. Conforme los pronunciamientos en *Pueblo* v. *Ortiz Rodríguez*, 103 D.P.R. 368, 372 (1975), las fotografías fueron correctamente admitidas para ilustrar hechos esenciales sobre los cuales habían declarado los testigos, *Pueblo* v. *Torres*, 75 D.P.R. 231, 235 (1953) ; para demostrar las lesiones producidas, *Pueblo* v. *Pacheco Stevenson*, 83 D.P.R. 842, 848 (1961), y para corroborar el testimonio de algunos testigos, *Pueblo* v. *Rodríguez Colón*, 95 D.P.R. 614, 617–618 (1967). En resumen, eran admisibles por versar sobre innumerables hechos pertinentes sobre los cuales varios testigos oralmente atestaron. *Pueblo* v. *Márquez*, 67 D.P.R. 326, 335 (1947).

A través del proceso, al acusado López Rodríguez se le han concedido y reconocido todos los derechos constitucionales y legales a que es acreedor. Reconocerle más sería una adjudicación injusta que —a tenor de la Asamblea Constituyente— no conjuga con mesura los derechos individuales y compromete peligrosamente los derechos y bienestar de la comunidad.

*Deberá dictarse sentencia confirmatoria.*

El Juez Asociado Señor Rebollo López emitió opinión disidente. La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Hernández Denton disienten y se unen al Juez Asociado Señor Rebollo López únicamente en cuanto a lo expresado en la Parte II de su opinión disidente.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

No hay duda alguna que el asesinato de cualquier ser humano ofende y hiere la sensibilidad de todos los que vivimos y compartimos esta bendita isla. Es un acto que atenta contra lo más profundo de nuestro ser. Cuando se trata, como en el presente caso, del asesinato y violación de una dama de sesenta y ocho años de edad, el mismo resulta repugnante a la mente humana.

Ahora bien, el hecho que existan individuos que sean capaces de incurrir en dicha conducta no puede tener el efecto de causar en la mente de las personas que tienen la *obligación* de velar por que exista en nuestro País un *sistema de justicia justo para todos por igual* la actitud de obviar el debido proceso de ley y de pasar por alto aquellos principios fundamentales sobre los cuales precisamente se apoya nuestro sistema de justicia. Esto es, no podemos permitir que la antipatía y otras emociones —que como seres humanos obvia y naturalmente experimentamos— nublen y confundan nuestro entendimiento jurídico, *haciendo que nos olvidemos de la función y misión que como jueces venimos obligados a desempeñar*. Todo el que haya sido juez está consciente de que dicha misión, en ocasiones, resulta dolorosa y amarga. Se asemeja, en cierto sentido, a la labor que realiza un padre responsable y consciente; con el agravante, naturalmente, que la decisión a ser emitida por el juez no sólo tiene que ser conforme a los principios básicos que deben regir las vidas de los seres humanos sino que tiene que "ajustarse a Derecho".

Nuestro sistema de justicia es "administrado" por seres humanos que, como tales, cometen errores. Ahí la *única* razón que puede justificar el que nos veamos impedidos de llevar a cabo "juicios perfectos". *Ello, sin embargo, debe ser siempre nuestro objetivo.* Aceptar como meta lo contrario, desafortunadamente tendrá la consecuencia indeseada de que cada día nuestro sistema de justicia será más imperfecto, llegando el día en que el deterioro sea de tal magnitud que el mismo no sólo no será perfecto sino que tampoco será justo.

No hay excusa alguna para un tribunal que, consciente de que se han cometido unos errores fundamentales que han tenido el efecto de impedir que el juicio celebrado haya sido uno justo, le dé la espalda a dicha situación y se escude, tratando de justificar dicha actitud, detrás de unos llamados filosóficos emotivos referentes a la ola de criminalidad que desgraciadamente azota a nuestro pueblo. La referida actitud puede tener graves consecuencias sobre nuestro ordenamiento jurídico en general y sobre la vida y libertad de nuestros conciudadanos, *en especial sobre aquellos sectores de nuestro pueblo que tradicionalmente sufren en mayor grado los impactos de actitudes como ésta.*

## I

En el presente caso el Tribunal confirma unas convicciones decretadas ante el Tribunal Superior de Puerto Rico, Sala de Mayagüez, las cuales procede revocar —y ordenarse la celebración de un nuevo juicio— por haberse incurrido en una violación del debido proceso de ley y por haber cometido el tribunal de instancia craso error perjudicial —relativo el mismo a la admisión de evidencia— que amerita la revocación.

Se confirman las sentencias apeladas —resultantes las mismas de un proceso celebrado en ausencia del apelante— no obstante el hecho de no haberse cumplido con el primero de los tres requisitos que exige la ley y la jurisprudencia vigente respecto a cuándo se puede celebrar un proceso en ausencia del

imputado de delito; esto es, el ser debidamente citado para el día en específico en que va a comenzar el juicio en su contra.

Por otro lado, se resuelve en el presente caso —contrario a la ley vigente y a claros y numerosos precedentes jurisprudenciales a esos efectos— que no constituye error perjudicial que amerita la revocación de la admisión en evidencia de una "confesión" obtenida sin que se hubiera informado adecuadamente al acusado de los derechos exigidos por las Constituciones del Estado Libre Asociado de Puerto Rico y la de Estados Unidos de América y la jurisprudencia aplicable a esta clase de situaciones.

## II

La Regla 58, inciso (b), de Procedimiento Criminal establece:

*Regla 58. Advertencia sobre nombre del acusado y juicio en ausencia*

.    .    .    .    .    .    .    .

(b) En el acto de lectura de acusación, *el tribunal señalará la fecha para el juicio y apercibirá al acusado que de no comparecer, podrá celebrarse el juicio en su ausencia,* incluyendo la selección del jurado y todas las etapas hasta el veredicto o fallo y el pronunciamiento de la sentencia y que su incomparecencia voluntaria equivaldrá a una renuncia a estar presente en estas etapas del proceso. (Énfasis suplido.)

Por su parte, la Regla 243, en su inciso (a), dispone:

*Regla 243. Presencia del acusado*

(a) Delitos graves. En todo proceso por delito grave (*felony*) *el acusado deberá estar presente* en el acto de la lectura de la acusación *y en todas las etapas del juicio,* incluyendo la constitución del jurado y la rendición del veredicto o fallo, y en el pronunciamiento de la sentencia. Si el acusado ha comparecido al acto de la lectura de la acusación, *y habiendo sido advertido conforme a la Regla 58 y citado para juicio no se presentase, el tribunal luego de investigadas las causas,* podrá celebrar el mismo en su ausencia hasta que recayere fallo o veredicto y el pronunciamiento de la sentencia,

siempre que el acusado estuviese representado por abogado. Si en cualquier etapa durante el juicio el acusado no regresare a sala para la continuación del mismo, el tribunal luego de investigadas las causas, podrá dictar mandamiento ordenando su arresto, pero en todo caso la ausencia voluntaria del acusado no impedirá que el juicio continúe hasta que se rinda el veredicto o el fallo y el pronunciamiento de la sentencia. (Énfasis suplido.)

Una somera lectura de dichas disposiciones legales es todo lo que se necesita para poder uno percatarse que son tres (3) los requisitos que exigen las transcritas reglas para que se pueda celebrar un proceso en ausencia del imputado de delito, a saber: (1) que el acusado haya sido debidamente citado o notificado *del señalamiento para juicio;* (2) que haya sido apercibido que de no comparecer *en dicho día* podrá celebrarse el juicio en su ausencia, y (3) que ante su incomparecencia *en dicho día,* el tribunal realice gestiones razonables tendentes a cerciorarse que su ausencia efectivamente es voluntaria.

Las disposiciones antes reseñadas que permiten, previo el cumplimiento de los tres enumerados requisitos, la celebración y continuación del proceso en ausencia del imputado de delito fueron el producto de la Ley Núm. 138 de 23 de julio de 1974, enmendatoria de las citadas Reglas 58 y 243 de Procedimiento Criminal.

En la exposición de motivos de la referida Ley Núm. 138, *supra,* se expresa que el "propósito de esta legislación es autorizar en casos graves la continuación y celebración de la vista del caso en su fondo, en ausencia de personas encau[s]adas *que han sido debidamente citadas* y apercibidas personalmente de las consecuencias que tales incomparecencias le causaría[n], con el fin de imprimirle mayor rapidez a los procedimientos judiciales obviando indebidas suspensiones, y evitando así, que el sistema de justicia en el área criminal se vea afectado por la conducta de los acusados". (Énfasis suplido.)

Respecto a esta materia, la norma jurisprudencial imperante en nuestra jurisdicción es a los efectos de que únicamente cuando se da "el hecho de que un acusado *debidamente citado* y apercibido de las consecuencias de su evasión, desaparece sin explicación de la jurisdicción donde tiene juicio pendiente, su conducta debe tomarse como renuncia voluntaria a las garantías constitucionales provistas para quien se enfrenta en juicio a su acusador". *Pueblo* v. *Colón Colón*, 105 D.P.R. 880, 886 (1977).

Como es sabido, la Regla 43 de las Reglas Federales de Procedimiento Criminal constituye la fuente principal de la Regla 243 nuestra, con la única diferencia que la regla federal requiere siempre la presencia del acusado en el acto de dictar sentencia en casos de delitos graves. Interpretando la mencionada Regla 43 federal, en *United States* v. *Tortora*, 464 F.2d 1202, 1208–1209, *cert.* denegado, 409 U.S. 1063 (1972), el Tribunal de Apelaciones de Estados Unidos para el Segundo Circuito expresó:

*Waiver of a constitutional right must be both "knowing" and "voluntary"*. A defendant who deliberately fails to appear in court does so voluntarily, *and thus the important question is whether his absence can be considered a "knowing" waiver*. We hold that it can. The deliberate absence of a defendant *who knows that* he stands accused in a criminal case *and that the trial will begin on a day certain* indicates nothing less than an intention to obstruct the orderly processes of justice. No defendant has a unilateral right to set the time or circumstances under which he will be tried. See *United States* v. *Bentvena*, 319 F.2d 916 (2nd Cir.) cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). *When a trial judge designates a date for trial the defendant's obligation is to appear ready in court on that date.* "[T]he right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty". *Stack* v. *Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 4, 96 L.Ed. 3 (1951).

Without this obligation on the accused the disposition of criminal cases would be subject to the whims of defendants who could frustrate the speedy satisfaction of justice by absenting themselves from their trials. Today more than ever the public interest demands that criminal proceedings be prosecuted with dispatch, see Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, 28 U.S.C.A. 442 (1972 Supp.), and the greater the delay between the charge and the trial date, the greater the likelihood that witnesses will be unable to appear or that their memories will have faded and their testimony will be less convincing. That a defendant can be convicted of bail-jumping if he fails to appear at trial is not sufficient to vindicate the public interest; the public is entitled to a speedy disposition of the criminal charges absent a finding by the court that good reasons exist for delay. "Thus there can be no doubt whatever that the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward." *Illinois* v. *Allen,* 397 U.S. [337], 349, 90 S.Ct. [1057], 1063, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring). A defendant's knowing and deliberate absence does not deprive the court of the power to begin the trial and to continue it until a verdict is reached.

Before a trial may proceed in the defendant's absence, the judge must find that the defendant has had adequate notice of the charges and proceedings against him. Notice is initially given to a defendant by the issuance of an indictment. But not until the defendant answers the indictment by pleading in open court to the charges therein can a court know with certainty that the defendant has been apprised of the proceedings begun against him. Thus no defendant can be tried until after he personally has entered a plea to the charge. *It must clearly appear in the record, however, that the defendant was advised when proceedings were to commence* and that he voluntarily, knowingly, and without justification *failed to be present at the designated time and place* before the trial may proceed in his absence. *Cureton* v. *United States,* 130 U.S.App.D.C. 22, 396 F.2d 671, 676 (1968); *State* v. *Tacon,* [107 Ariz. 353, 488 P.2d 973 (1971)]. *This assures that the defendant has been accorded an opportunity to be present at all critical stages of the*

*trial, see Rule 43 F.R.Crim. P., and thereby affords him due process of law. Having received actual notice when trial proceedings will take place, in the absence of some compelling excuse the defendant cannot obstruct the course of justice by absenting himself from the process, cf. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).* (Énfasis suplido.) ([1])

Como podemos notar, para que el proceso celebrado en ausencia del acusado no violente el debido procedimiento de ley resulta indispensable, como primer requisito, que el imputado de delito haya sido citado para *el día en específico* en que el juicio va a comenzar o a continuar. ([2]) Esa ha sido y es —hasta el día de hoy— la norma imperante en nuestra jurisdicción; norma acorde con la vigente en la esfera federal.

La opinión mayoritaria que emite el Tribunal en el día de hoy, por el contrario, establece que un tribunal está facultado para celebrar un juicio en ausencia del acusado —aun cuando éste no haya sido citado específicamente para el día en que comienza el mismo— siempre y cuando que el acusado hubiera advenido en conocimiento de que había una acusación contra él —obviamente en el acto de lectura de acusación— y hubiera sido apercibido de las consecuencias de no estar presente el día en que el tribunal tenga a bien señalar el juicio. *Esto es, releva al Estado de la obligación de citar al acusado para una fecha de juicio en específico y le impone a éste la responsabilidad y obligación continua de mantenerse informado sobre la fecha*

---

([1]) Véanse, en adición: *Government of Virgin Islands* v. *Brown,* 507 F.2d 186 (3er Cir. 1977); *United States* v. *Rueda,* 549 F.2d 865 (2do Cir. 1977); *United States* v. *Pastor,* 557 F.2d 930 (2do Cir. 1977); *State* v. *LaBelle,* 568 P.2d 808 (1977); *United States* v. *Sanchez,* 790 F.2d 245 (2do Cir. 1986).

([2]) Naturalmente, en adición, se tiene que demostrar que el tribunal apercibió adecuadamente al acusado de las consecuencias de su ausencia y que se realizaron gestiones razonables conducentes a demostrar que la ausencia es una voluntaria.

*del juicio y la de comparecer el día en que el tribunal decida
comenzar la celebración del mismo.*

Lo curioso de la decisión emitida por el Tribunal en el día
de hoy resulta ser que los casos —tanto de otras jurisdicciones
como de la nuestra— que invoca la opinión mayoritaria en
apoyo de la norma que establece no sostienen la misma. Un
examen de los mismos demuestra que en todos y cada uno de
ellos el acusado había sido citado para el *día específico* en que
éste no compareció al tribunal, ya fuera para el comienzo del
juicio, ya para la continuación del mismo. De manera pues,
que las "impresionantes citas" que de dichos casos se hacen
realmente son autoridad para sostener la norma contraria a
lo establecido en el día de hoy por el Tribunal.

En la opinión mayoritaria que se emite se detallan exten-
samente todas las gestiones que fueron realizadas para lograr
localizar al acusado, luego de éste ser excarcelado el 28 de
junio de 1984 y que el caso quedara sin señalamiento de juicio.
El problema que plantea el presente caso, sin embargo, no es
si la ausencia del acusado fue o no voluntaria. Ello no se cues-
tiona. El punto en controversia es que el acusado *nunca* fue
citado para el día en que el tribunal de instancia finalmente
decidió dar comienzo al proceso en su contra. Respecto a ello,
expresa el Tribunal que la "tesis de que no procedía el juicio
pues después de la vista de la lectura de acusación no se le
citó específicamente para una fecha, no puede prevalecer". Se
argumenta que ello significaría que un acusado puede ocul-
tarse para evitar ser juzgado.

¿Es realmente ello así? Creemos que no. Todo lo que se re-
quiere que hagan los tribunales de instancia para evitar esta
indeseable situación es que citen en corte abierta a los acusa-
dos para una fecha específica cada vez que se suspenda un jui-
cio. ¿Es ello oneroso? La contestación parece ser obvia. De
hecho, si en el presente caso el Tribunal Superior, Sala de
Mayagüez, —en lugar de, inexplicable e inexcusablemente,
dejar el caso sin señalamiento para juicio el día 28 de junio

de 1984— en cumplimiento de su deber hubiera o comenzado el juicio en dicho día o señalado el mismo, y citado al acusado para una nueva fecha, la situación que hoy se nos plantea no hubiera surgido. Nos preguntamos: esa actuación inexplicada por parte del tribunal de instancia, ¿amerita que este Tribunal abandone una norma correcta que garantiza los derechos de todos los acusados *por una que se puede prestar al abuso de esas garantías*? Creemos que no. Como se expresara en *Pueblo* v. *Colón Colón*, ante, pág. 883, si "la exigencia de debido proceso como máxima garantía de libertad, satura y dirige el juicio cuando el acusado está presente, *con mayor razón debe respetarse el debido proceso provisto por las Reglas para el que se halla ausente sin explicación*". (Énfasis suplido.)

En el presente caso resulta obvio que se infringió el debido proceso de ley. El apelante nunca tuvo conocimiento de la fecha cierta y específica para la cual el tribunal de instancia señaló el comienzo del juicio. Se cometió el error señalado.

### III

Durante el proceso celebrado, el Ministerio Público ofreció y el tribunal de instancia admitió en evidencia, no obstante la objeción de la defensa, una alegada confesión brindada por el acusado ante el fiscal investigador, Hon. Javier Zambrana Grana.([3]) En apelación, mediante el segundo señalamiento de error, el apelante ataca dicha actuación señalando que dicha confesión es una "carente de voluntariedad por no haber sido prestada consciente e inteligentemente", y que el error cometido por el tribunal de instancia al así actuar amerita la revocación de las convicciones decretadas.

La Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sec. 11, expresa —en lo pertinente— que en "todos los procesos criminales, el acusado disfrutará del de-

---

([3]) Según ello surge de la minuta de fecha 15 de agosto de 1985 que recoge los procedimientos acaecidos durante dicho día.

recho a . . . tener asistencia de abogado" y que nadie "será obligado a incriminarse mediante su propio testimonio". Nos atrevemos a decir, sin temor a equivocarnos, que el derecho constitucional que tiene todo ciudadano de este País a permanecer callado y a no incriminarse y que su silencio no pueda ser tomado en cuenta es la *piedra angular* de nuestro derecho y procedimiento criminal.

Hace más de dos décadas, mediante una ilustrativa y ejemplarizante opinión del señor Juez Asociado Carlos Santana Becerra, Q.E.P.D., este Tribunal se pronunció afirmativa y valientemente en defensa de estos derechos fundamentales, de paso adelantándosele a muchos tribunales de otras jurisdicciones. En *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765, 776 (1965), se expresó, en lo pertinente que:

> . . . no son admisibles en evidencia en el "proceso criminal" la confesión de un acusado o sospechoso o las admisiones que le perjudiquen sustancialmente, obtenidas de él *bajo custodia de la policía u otra autoridad competente* mientras se le interroga con el fin de obtener manifestaciones incriminatorias: (1) cuando no fue *advertido de manera eficaz* por la policía u otra autoridad competente antes de declarar, *de su derecho constitucional absoluto* a permanecer en silencio y a no incriminarse; y (2) cuando no fue *advertido* por la policía u otra autoridad competente antes de declarar, *de su derecho a tener ayuda de abogado,* sin que el hecho de no haber sido solicitada afirmativamente por el acusado releve de la obligación de advertirle su derecho a tenerla . . . . (Énfasis suplido.)

Reconocimos en el citado caso de *Rivera Escuté v. Jefe Penitenciaría,* ante, págs. 781–782, que dichos derechos pueden ser objeto de renuncia por parte de un acusado siempre que la misma haya sido *inteligente* y *conscientemente* realizada. Expresamos, sin embargo, que:

> En este sentido cada caso se decidirá también por sus propios hechos y circunstancias como en toda otra renuncia de derechos fundamentales, *pero incuestionablemente, la ausen-*

*cia de ayuda y consejo legal para una renuncia consciente e inteligente de ese consejo y ayuda será a la vez factor de mayor importancia en la determinación de la propiedad de la renuncia misma.* (Énfasis suplido.)

De manera, pues, que desde hace más de veinte años es norma firmemente establecida en nuestra jurisdicción *que no se trata de la mera lectura mecánica, sin explicación, de unas advertencias,* llevadas a cabo con el único objetivo de cumplir con el requisito.[4] Se exige, en palabras del Juez Santana Becerra, que el acusado sea advertido de sus derechos "de manera eficaz". No se trata, como pretende hacernos creer la opinión mayoritaria, "de que una persona que ha llegado a ser delincuente está además obligada a ser mentiroso o perjuro toda su vida". *El derecho constitucional contra la autoincriminación no se circunscribe a semejante simpleza.* Los representantes del Estado, en cumplimiento del mandato constitucional y jurisprudencial vienen en la obligación de *explicarle* al sospechoso o acusado los derechos que le cobijan *en tal forma que éste entienda los mismos.* En otras palabras, lo determinante no es que le "informen" las advertencias al acusado; *lo verdaderamente importante es que el acusado comprenda lo que le informan.*

Por otro lado, la presencia o ausencia de abogado en la toma de una confesión, como hemos visto, es factor importantísimo en la decisión que tiene que hacer el tribunal, a posteriori, sobre la renuncia que de ese derecho constitucional hiciera el acusado. Y es que es lógico que ello sea así. No puede perderse de vista que el representante del Ministerio Fiscal, desde ese momento, es la "parte adversa" cuyos propósitos y objetivos ciertamente no son los "mejores intereses" del sospechoso o acusado. En su consecuencia, la presencia del abogado en la toma de una confesión es una garantía de que el

---

[4] Véase, sobre este particular, *Tague v. Louisiana,* 444 U.S. 469 (1980).

acusado renunció al derecho constitucional en controversia después de haber sido eficazmente advertido del mismo. Por el contrario, la toma de una confesión en ausencia de abogado es una que debe ser examinada cuidadosa y detenidamente. De hecho, en palabras del Tribunal Supremo de Estados Unidos, "the courts *must presume* that a defendant did not waive his rights; the prosecution's burden is great". (Énfasis suplido.) *North Carolina* v. *Butler*, 441 U.S. 369, 373 (1979) ; *Tague* v. *Louisiana*, 444 U.S. 469 (1980).

Naturalmente, que no toda renuncia del derecho contra la autoincriminación —de otro modo voluntaria, inteligente y conscientemente realizada— resulta inválida meramente por el hecho de que al hacerse la misma el sospechoso o acusado no contó con el asesoramiento de un abogado. *En esa clase de situación, adquiere importancia y relevancia la persona del acusado y sus circunstancias personales y particulares.* Ciertamente no es la misma situación cuando se trata de un sospechoso o acusado con instrucción académica que pueda entender con facilidad lo que se le explica que cuando es una persona analfabeta con dificultad para comprender lo que se le informa.

Como es sabido, desde que resolvimos en el año de 1965 a *Rivera Escuté* v. *Jefe Penitenciaría*, ante, tanto nuestra jurisprudencia como la federal han evolucionado grandemente. Para que se considere que una renuncia al derecho constitucional contra la autoincriminación pueda ser considerada como una realizada en forma *"voluntaria, consciente e inteligente"*, se requiere que el Estado le informe, de manera eficaz, al sospechoso o acusado ciertas y determinadas "advertencias", a saber: que tiene el derecho a permanecer callado; que cualquier manifestación que haga podrá ser utilizada como evidencia en su contra; que tiene el derecho a consultar con un abogado de su selección antes de decidir si declara o no y contar con la asistencia de éste durante el interrogatorio; y que de no tener dinero para pagar un abogado, el Estado viene en

la obligación de proveérselo. Véanse, entre otros: *Pueblo* v. *De Jesús Cabrera,* 94 D.P.R. 450 (1967) ; *Pueblo* v. *Chaar Cacho,* 109 D.P.R. 316 (1980) ; *Pueblo* v. *Ríos Álvarez,* 112 D.P.R. 92 (1982) ; *Pueblo* v. *Cabán Torres,* 117 D.P.R. 645 (1986) ; *Miranda* v. *Arizona,* 384 U.S. 436 (1966) ; *Legor* v. *Towmey,* 404 U.S. 477 (1972) ; *Michigan* v. *Tucker,* 417 U.S. 433 (1974) ; *Michigan* v. *Mosley,* 423 U.S. 96 (1975) ; *Colorado* v. *Spring,* 55 L.W. 4162 (1987), y *Connecticut* v. *Barrett,* 55 L.W. 4151 (1987).

Una renuncia del mencionado derecho es "voluntaria" cuando la misma es realizada sin que haya mediado la intimidación, la coacción o la violencia por parte de los funcionarios del Estado en el proceso que culmina en la toma de la confesión. A este respecto véase *Colorado* v. *Connelly,* 479 U.S. — (1986), 55 L.W. 4043 (1986). Ello no está en controversia en el presente caso.

Por otro lado, ¿cuándo es que una renuncia de esta naturaleza puede ser considerada como una "consciente e inteligente"? En palabras del Tribunal Supremo de Estados Unidos, "[t]he *Miranda* warnings ensure that a waiver of these rights is *knowing* and *intelligent* by requiring that the suspect *be fully advised* of this constitutional privilege, *including the critical advice that whatever he chooses to say may be used as evidence against him*". (Énfasis suplido.) Véase *Colorado* v. *Spring,* ante, pág. 4165.

Los tribunales, en esta clase de situaciones, vienen obligados a examinar la "totalidad de las circunstancias" que rodearon la toma de la confesión. Como expresara la Juez O'Connor del Tribunal Supremo federal en *Moran* v. *Burbine,* 475 U.S. — (1986) : (5)

> Echoing the standard first articulated in *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357 (1938), Miranda holds that "[t]he defendant may

---

(5) 89 L.Ed. 410, 420.

waive effectuation" of the rights conveyed in the warnings *"provided the waiver is made voluntarily, knowingly and intelligently."* 384 U.S. at 444, 475, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 Ohio Misc. 9, 36 Ohio Ops. 2d 237, 10 A.L.R.3d 974. *The inquiry has two distinct dimensions. Edwards* v. *Arizona,* supra, at 482, 68 L.Ed.2d 378, 101 S.Ct. 1880; *Brewer* v. *Williams,* 430 U.S. 387, 404, 51 L.Ed.2d 424, 97 S.Ct. 1232, (1977). *First* the relinquishment of the right must have been *voluntary* in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. *Second,* the waiver must have been made with *a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.* Only if the *"totality of the circumstances surrounding the interrogation"* reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. *Fare* v. *Michael C.,* 442 U.S. 707, 725, 61 L.Ed.2d 197, 99 S.Ct. 2560 (1979). See also *North Carolina* v. *Butler,* 441 U.S. 369, 374–375, 60 L.Ed.2d 286, 99 S.Ct. 1755 (1979). (Énfasis suplido.)

¿Qué *"indagaciones"* debe hacer un tribunal bajo el criterio de la "totalidad de las circunstancias"? En *Fare* v. *Michael C.,* 442 U.S. 707, 725 (1979), el referido Tribunal Supremo federal expresó:

This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. *We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so.* The totality approach permits—indeed, it mandates—inquiry *into all the circumstances* surrounding the interrogation. *This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.* See *North Carolina* v. *Butler,* supra. (Énfasis suplido.)

## IV

Examinemos los hechos pertinentes del caso ante nuestra consideración a la luz de los principios antes reseñados. Los autos demuestran que:

*A*— Es un hecho incuestionable que el apelante, no obstante haberse determinado que estaba en estado procesable, (⁶) es una *persona analfabeta* (⁷) que se vio obligada a abandonar la escuela en los primeros grados *por tener dificultad para asimilar la enseñanza.*

*B*— Los agentes de la Policía de Puerto Rico, al localizar originalmente al apelante, le informaron en *forma rutinaria* de sus derechos. En palabras del Agente Santos González: "Se dirigió a la casa de los padres de Miguel donde lo arrestó. Que cuando se encuentra con Miguel, *le informa que es sospechoso* de la muerte de Monserrate Sanabria *y mientras caminaban hacia la casa le hizo las advertencias de ley*". (Énfasis suplido.) Véase la pág. 21 de la Exposición Narrativa de la Prueba.

*C*— Que si bien es cierto que el fiscal Zambrana Grana testificó que en un momento determinado le había hecho todas las advertencias de ley al apelante, no es menos correcto que éste admitió que *"no se las explicó,* ni le brindó ejemplos en cada una de ellas. *Se limitó a preguntarle,* una vez finalizó, si las había entendido. *Tampoco le explicó las consecuencias de prestar la declaración".* (Énfasis suplido.) Véase pág. 17 de la Exposición Narrativa de la Prueba.

Específicamente declaró, a preguntas del abogado defensor, que no le informó al sospechoso *"de que con su declaración podía ser juzgado por Violación y Asesinato".* (Énfasis suplido.) Véase la pág. 17 de la Exposición Narrativa de la Prueba.

*D*— Consideramos necesario enfatizar —con el propósito de que se tenga un cuadro claro del "interés" que tuvo el fiscal Zambrana Grana en saber si el apelante, en palabras de la

---

(⁶) Hecho totalmente irrelevante a la cuestión aquí en controversia, sobre el cual la opinión mayoritaria hace gran énfasis.

(⁷) No sabe leer ni escribir pero puede firmar su nombre.

opinión mayoritaria, "tenía capacidad suficiente para entender lo que ocurría"— que este funcionario declaró que se había *percatado* que el apelante no sabía leer y escribir cuando "una vez *terminó todo el interrogatorio,* le dio para que leyera la declaración *y éste no podía leerla,* por lo que se solicitó al agente Cardona que se la leyera. Luego se la dio para que firmara y eso sí lo pudo hacer con dificultad". (Énfasis suplido.) Véase la pág. 16 de la Exposición Narrativa de la Prueba.

*E*— Por último, procede igualmente enfatizarse que al ser cuestionado el fiscal Zambrana Grana sobre el porqué no le proporcionó un abogado al apelante antes de proceder a tomar la confesión, dicho funcionario declaró que no obstante *no existir* impedimento alguno para ello, no lo hizo por razón de que entendió que ello "no era necesario". Véase la pág. 16 de la Exposición Narrativa de la Prueba.

## V

¿Se puede afirmar, con objetividad y tranquilidad de espíritu, que la "totalidad de las circunstancias" que rodearon la confesión que alegadamente prestara el apelante ese día ante el fiscal Zambrana Grana fue precedida por una renuncia de sus derechos en forma *consciente e inteligente?* La contestación a la pregunta que antecede requiere que, a su vez, nos cuestionemos si el apelante fue "advertido eficazmente" [8] —*fully advised*— [9] de los derechos constitucionales que le cobijan relacionados con esta clase de situaciones; o, lo que es lo mismo, si la renuncia que de estos derechos hizo el apelante fue una hecha con "conocimiento pleno" (*full awareness*) de tanto la naturaleza del derecho que renunciaba como de las consecuencias de la decisión de así hacerlo. [10] Debe recordarse, en adición, que conforme lo resuelto en *North Carolina* v. *Butler,* ante, le corresponde al Estado controvertir la *pre-*

---

[8] *Rivera Escuté* v. *Jefe Penitenciaría,* 92 D.P.R. 765 (1965).

[9] *Colorado* v. *Spring,* 55 L.W. 4162 (1987).

[10] *Moran* v. *Burbine,* 54 L.W. 4267 (1986).

*sunción* de que no medió una renuncia válida por parte del acusado a su derecho a no incriminarse.

En primer lugar, no puede perderse de vista que el apelante es una persona analfabeta con problemas de aprendizaje; esto es, una persona que con toda probabilidad se le hace más difícil comprender adecuadamente esta información. Somos del criterio que no es ilógico ni oneroso que se le exija a los representantes del Estado un mayor grado de esfuerzo al "informarle" las advertencias a este tipo de personas que cuando se confrontan a personas con cierto grado de instrucción.

¿Cuál fue la actitud de dichos funcionarios en el presente caso? Veamos. Según la declaración prestada por el agente González, él se limitó, al arrestar al apelante, a informarle las advertencias mientras caminaban hacia la casa del apelante; no le explicó las mismas, como tampoco se cercioró de que éste las hubiera entendido. Una lectura del resumen que de su declaración se hace en la exposición narrativa de la prueba demuestra que dicho incidente consistió en *un mero acto mecánico* que definitivamente no cumple con lo requerido por la jurisprudencia aplicable. Véanse: *Rivera Escuté* v. *Jefe Penitenciaría*, ante; *Tague* v. *Louisiana*, ante.

Examinemos la actuación del fiscal Zambrana. La conclusión contenida en la opinión mayoritaria a los efectos de que el referido funcionario "rigurosamente le hizo todas las advertencias de ley" al apelante no es correcta, no obstante ser cierto que dicho fiscal así lo hizo constar en una ocasión de su declaración. Dicho funcionario, como señaláramos anteriormente, *claramente admitió* en dos ocasiones diferentes *que no le explicó* al apelante "las consecuencias de prestar la declaración". Ello, naturalmente, constituye una *crasa violación* a la abundante jurisprudencia al efecto, la cual, *mandatoriamente requiere* que se le informe al sospechoso o acusado —en lenguaje utilizado por el Tribunal Supremo federal en *Colorado* v. *Spring*, ante— la *crítica advertencia* de que cualquier

manifestación que éste haga podrá ser utilizada como evidencia en su contra. Véase, en adición, *Pueblo* v. *De Jesús Cabrera*, ante.

Como si lo anteriormente señalado fuera poco, surge con meridiana claridad de la propia declaración del fiscal Zambrana Grana el *poco* o *ningún* interés que tuvieron los representantes del Estado en conocer o cerciorarse si el apelante tenía la capacidad suficiente para comprender, o si efectivamente había comprendido, lo que ellos alegadamente le informaron sobre los derechos que le asistían. Recordemos que el fiscal Zambrana Grana admitió que advino en conocimiento del analfabetismo del apelante cuando, *luego de prestada y transcrita la confesión*, al dársela para que éste leyera la misma, el apelante no pudo hacerlo.

Prueba adicional de la "actitud de indiferencia" de parte de estos funcionarios hacia los derechos del apelante lo constituye lo declarado por el fiscal Zambrana Grana respecto a la advertencia sobre el derecho a asistencia de abogado. ¿Cumplió dicho fiscal, de "manera eficaz", con dicho requisito? Basta señalar que el funcionario declaró que, no obstante no haber impedimento alguno para poder proporcionarle gratuitamente un abogado al apelante, él hizo la gestión por cuanto entendió que ello "no era necesario".

Ante esos hechos adquieren gran relevancia en el presente caso las sabias palabras expresadas por el Hon. Carlos Santana Becerra en *Rivera Escuté* v. *Jefe Penitenciaría*, ante, págs. 781–782, a los efectos de que "la ausencia de ayuda y consejo legal" en la toma de una confesión será factor de gran importancia "en la determinación de la propiedad de la renuncia misma".

Somos del criterio que la prueba presentada por el Ministerio Público durante el proceso celebrado en apoyo de su solicitud de que se admitiera en evidencia la confesión impugnada, no derrota la *presunción* de que el apelante no renunció adecuadamente a los derechos constitucionales que le

cobijaban, *North Carolina* v. *Butler*, ante; esto es, con "cono-
cimiento pleno" (*full awareness*) de sus derechos y de las con-
secuencias que acarreaba la renuncia de los mismos. *Moran* v.
*Burbine*, ante.

En resumen, disentimos por cuanto entendemos que el tri-
bunal de instancia cometió grave error de derecho al admitir
en evidencia la confesión prestada por el apelante ante el
representante del Ministerio Público. Somos de la opinión que
un análisis objetivo bajo el criterio de la "totalidad de las cir-
cunstancias", *Moran* v. *Burbine*, ante, demuestra que —inde-
pendientemente de que la confesión prestada fue una "volun-
taria", desde el punto de vista que no medió intimidación,
coacción, o violencia— la misma no fue prestada por el ape-
lante en forma "consciente e inteligente" por razón de que él
no fue "eficazmente advertido" de sus derechos constituciona-
les por parte de los representantes del Estado. *Rivera Escuté*
v. *Jefe Penitenciaría*, ante.

## VI

Realmente resulta innecesario refutar las aseveraciones
contenidas en el escolio Núm. 6 de la opinión que emite una
mayoría de este Tribunal. Las mismas, sin embargo, son tan
erróneas que se nos hace verdaderamente imposible ignorarlas.

Merece especial mención y atención las expresiones conte-
nidas en el primer párrafo del mencionado escolio, a saber:

(6) Aun bajo la hipótesis errónea de que no debió admi-
tirse esa confesión —y en vista de que según la prueba antes
detallada de carácter circunstancial e inferencias lógicas y
razonables concluyentemente se demostró más allá de duda
razonable que él fue el autor del crimen— pues, sin contra-
dicciones de ningún tipo *todos* los testigos, incluyendo sus
familiares inmediatos, produjeron los datos que evaluados,
integral y desapasionadamente, apuntan hacia esa sola con-
clusión, *quaere*, si por ser la confesión *acumulativa*, su ex-
clusión hubiese variado el veredicto y el error cometido no
perjudicial más allá de duda razonable. . . .

Como debe ser conocido por todos, una prueba o evidencia es o resulta ser "acumulativa" cuando "duplica" otra evidencia que ya ha sido admitida por el tribunal durante la celebración de un proceso en particular; esto es, cuando dicha evidencia resulta ser "repetitiva" por constituir prueba que versa sobre el mismo hecho o materia en relación con la cual ya previamente se ha admitido otra evidencia. *United States* v. *Ives*, 609 F.2d 930 (9no Cir. 1980); *United States* v. *Jamil*, 707 F.2d 638 (2do Cir. 1983).[11] Precisamente por ser esta evidencia una "repetitiva" es que nuestros tribunales de instancia tienen discreción para rechazar la misma. Véase la Regla 19 de Evidencia de 1979.

Una mayoría de los señores jueces que integran el Tribunal cataloga la confesión que las autoridades obtuvieron del apelante en el presente caso como prueba "acumulativa". ¿Es ello correcto? La contestación, nuevamente, parece ser obvia. Veamos.

Un examen del resumen que hace el propio Tribunal de la "otra" prueba que durante el proceso celebrado presentara el Estado sitúa al apelante, alrededor del mediodía del 1ro de diciembre de 1983, en un pequeño negocio del barrio donde residía en compañía de un amigo —Pedro Rodríguez Martínez— que lo conocía desde la infancia; estando ambos allí, llegó la occisa al referido negocio, a quien Rodríguez Martínez le "pagó un trago"; los tres abandonaron juntos el negocio, "dándose un palo", durante el camino, de una "caneca de ron" que el apelante había comprado; como a eso de las 5:30 de esa tarde el testigo Rodríguez Martínez se despidió de ellos, continuando juntos el apelante y la occisa, quien ayudaba a éste a caminar; alrededor de las 8:00 P.M. de dicho día, el apelante

---

[11] Véanse, en adición: *United States* v. *Balliviero*, 708 F.2d 934 (1983), *cert.* denegado, 464 U.S. 939; *Canavin* v. *Pacific Southwest Airlines*, 196 Cal. Rptr. 82 (1983); *In re Beverly Hills Fire Litigation*, 695 F.2d 207 (1982), *cert.* denegado, 461 U.S. 929; *United States* v. *Edwards*, 631 F.2d 1049 (1980).

fue a casa de una vecina, con quien *intentó* hablar "algo importante que había sucedido", notando la vecina que el apelante estaba "un poco borracho"; el apelante llegó a su casa, pasadas las 8:00 P.M., con la ropa sucia, comiendo algo en la cocina y hablando con su padre a quien le expresó que "se iba lejos", marchándose de la casa. Por último, vecinos del lugar encontraron al otro día —2 de diciembre de 1983— el cadáver de la occisa, notificándose a la Policía de Puerto Rico. En adición a dicha prueba, naturalmente, se admitió en evidencia la declaración del patólogo forense que practicó la autopsia en el cadáver de la occisa que establece la causa de la muerte como "asfixia por sofocación".

Esa, básicamente, es toda la "otra" prueba que presentó el Ministerio Fiscal durante el proceso que se celebrara en ausencia del apelante. La confesión —donde el apelante relata haberle causado la muerte a la occisa y haber sostenido relaciones sexuales con ella— ¿resulta ser evidencia "repetitiva"? ¿"Duplica" la otra evidencia presentada? ¿Tenía discreción el tribunal de instancia para rechazar su admisión por ser "repetitiva"? La contestación en la negativa resulta ser obligatoria.

Es por ello que realmente no alcanzamos a comprender, *primero*, cómo es que una mayoría de los integrantes de este Tribunal puede catalogar la confesión en controversia como prueba de carácter acumulativo, *y segundo*, cómo pueden aseverar que "bajo la hipótesis errónea de que no debió admitirse esa confesión", *el error cometido sería uno "no perjudicial"*.

Como es sabido, la Regla 4 de Evidencia de Puerto Rico controla, *en términos generales*, esta situación. La misma dispone:

*Regla 4. Efecto de error en la admisión de evidencia*

No se dejará sin efecto una determinación de admisión de evidencia ni se revocará sentencia o decisión alguna por motivo de admisión errónea de evidencia a menos que:

(1) La evidencia fue erróneamente admitida a pesar de la oportuna y correcta objeción de la parte perjudicada por la admisión, y

(2) El tribunal que considera el efecto de la admisión errónea entiende que ésta *fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita.* (Énfasis suplido.)

Somos del criterio que el término clave en el inciso (2) de la transcrita Regla 4 lo es la palabra "factor". ¿Qué significa el que una evidencia erróneamente admitida haya sido *factor* decisivo o sustancial en la *sentencia* o decisión cuya revocación se solicita? A nuestro juicio la contestación es sorprendentemente sencilla. Entendemos que definitivamente no nos podemos *limitar meramente* a cuestionarnos —como se resuelve en la opinión confirmatoria emitida en el presente caso— si existe otra prueba que a juicio de este Tribunal apelativo demuestra la culpabilidad del apelante más allá de duda razonable.

El criterio que debemos y tenemos que utilizar —independientemente de la existencia de esa otra prueba— *en casos "ordinarios" de errores en la admisión de evidencia* es si de no haberse admitido erróneamente la prueba en controversia "probablemente el resultado hubiera sido distinto". *Pueblo* v. *Mangual Hernández*, 111 D.P.R. 136, 145 (1981).[12] *Esto es, si la evidencia erróneamente admitida puede haber influenciado o pesado, de manera sustancial o decisiva, en la mente del juzgador de los hechos al éste emitir el veredicto o fallo.*

En relación con el caso específico ante nuestra consideración el asunto reviste mayor gravedad. Debe recordarse que el caso envuelve uno de los errores que el Tribunal Supremo de Estados Unidos clasifica como "errores constitucionales".

---

[12] En *Pueblo* v. *Mangual Hernández*, 111 D.P.R. 136, 145 (1981), establecimos la norma a los efectos de que:
"El criterio para determinar si un error en materia de evidencia acarrea revocación es determinar si, de no haberse cometido el error, *probablemente el resultado hubiera sido distinto.*" (Énfasis suplido.)

Véase *Chapman* v. *California*, 386 U.S. 18 (1967). Como es sabido, en dicho caso el Supremo federal resolvió que cuando se trata de un "error constitucional", para que el mismo pueda ser considerado como uno "no perjudicial" por el tribunal apelativo, dicho foro tiene que estar convencido de ello "más allá de duda razonable". Visto desde otro enfoque, el Estado —que resulta ser el "beneficiario" del "error constitucional" cometido— viene en la obligación de probar más allá de duda razonable que el error no tuvo ese efecto.

Si algo demuestra la experiencia es que, de ordinario, la prueba más incriminatoria y devastadora con que puede contar el Ministerio Fiscal contra un imputado de delito lo es la de que existe una admisión o confesión de éste. Ello es así por cuanto la mente de un juzgador razonable, objetivo e imparcial de unos hechos casi nunca puede estar totalmente libre de duda; ello todavía más cuando, como en el presente caso, la única otra prueba con que cuenta el Estado es de índole circunstancial. La prueba sobre una admisión o confesión del acusado tiene el efecto de disipar esa duda o intranquilidad en la mente del juzgador como por arte de magia.

Sostener, como lo hace la opinión mayoritaria, que en el supuesto de que el tribunal de instancia hubiera incurrido en error al admitir en evidencia la confesión prestada por el apelante, el mismo sería uno "no perjudicial" que no amerita la revocación de las sentencias apeladas representa o pecar de ingenuos o vivir en un edificio sin ventanas con total abstracción de la realidad que nos rodea; sobre todo cuando consideramos el "efecto cumulativo" que necesariamente tiene que haber causado en la mente de los señores del jurado tanto la confesión erróneamente admitida en evidencia como la celebración del juicio —en violación del debido procedimiento de ley— en ausencia del apelante.

Es por ello que somos de la opinión que los dos errores cometidos definitivamente evitaron que el apelante tuviera no sólo un juicio "perfecto" sino que uno "justo".